## William Davis *v.* John J. Mikell *et al.*

The rule at *law* is, that where several persons bind themselves jointly and severally by the terms of their contract, and nothing appears from the face of it to show that there exists the relation of principal and surety, all are to be regarded as principals. The form of the contract at *law* precludes the party from averring that he signed as *surety.* In *equity*, the true relation of the parties may be shown, notwithstanding the form of the contract holds them all out as principals.

A *judgment* against a principal and surety does not convert the surety into a principal debtor, so as to strip him of any equity he might subsequently have against the creditor, growing out of his character as surety.

If a plaintiff in an execution release a levy of the sheriff on personal property of the principal defendant, against the remonstrance of a defendant who is a surety of the principal defendant, such surety will thereby be released, and a new execution cannot issue against him on the judgment.

Where a levy was made on the land of the principal defendant in the execution, and the plaintiff, against the will of a co-defendant, who was a surety, released the levy on the land, and had a subsequent levy made on personal property of the principal defendant, whereupon the principal defendant executed a forthcoming bond, which the surety refused to sign, and which the plaintiff agreed to accept without his signature: held, that the surety was discharged, and that the plaintiff be perpetually enjoined from issuing his execution against said surety.

A suit was brought by Mikell and Robinson, executors, &c. and judgment recovered in Hinds circuit court, against all the makers of the following note:

"FEBRUARY 19th, 1838.

"Twelve months after date, we, or either of us, promise to pay unto John J. Mikell and Wm. M. Robinson, executors of A. G. Moore, deceased, two thousand four hundred and twenty dollars, for value received.

| | |
|---|---|
| JOHN McKNIGHT. | [Seal.] |
| H. T. BAILEY. | [Seal.] |
| WM. H. MARTIN. | [Seal.] |
| his | |
| WM. ☒ DAVIS. | [Seal.] |
| mark | |

William Davis *v.* John J. Mikell *et al.*

*Fieri facias* issued accordingly, and was levied on *land* of John McKnight, in the year 1839. McKnight was principal and the other parties sureties. The land was advertised for sale on a particular day, and Davis, the last named surety, was present on the day of sale, and urged the sheriff to sell the land, and told him he would bid the amount of the execution for the same. The sheriff, at the instance of the plaintiffs in execution, abandoned the sale, and made a second levy, on three slaves of said McKnight, and took a forthcoming bond of McKnight and others for the delivery of said slaves. Davis refused to sign this bond. It was executed without his name, and the plaintiffs' attorney made this indorsement on it: "The sheriff will receive this bond in the case specified therein. Oct. 29, 1839. BRIGGS, attorney." This bond was forfeited, and execution issued thereon against the principal and sureties therein. At the return term of this execution the forthcoming bond was quashed, at the instance of one of the sureties. The plaintiffs then issued execution on the original judgment against the parties thereto. Davis filed his bill to enjoin the levy of this execution upon his property, on the ground that he had been discharged by the laches of the plaintiffs.

FOOTE & HUTCHINSON for complainant. (First brief not filed.)

BRIGGS for respondents.

So far as I can see, this case depends on but two points, viz:

1. Can complainant, William Davis be regarded by the court in the light of a surety, so as to authorize the application to him of those rules of law which under certain circumstances discharge a surety from his liability.

2. If so, has the conduct of the defendant Robinson been such, in connection with the claim sued on in Hinds circuit court, the judgment, execution, forthcoming bond, &c. as to exonerate complainant from his liability under the original judgment, the execution on which has been arrested by him?

1. By adverting to the note sued on, we shall find it a common promissory note for the payment of a certain sum of money. The makers bind themselves jointly and severally, "we or either

of us," &c.    They make this promise also because of value re-
ceived by them.

And again, neither the word principal nor the word surety is to
be found in said note; nor, indeed, is there a single word, figure,
or letter in the note, or connected with the signatures of the ma-
kers, going to show that either regarded himself as surety of
McKnight, the first in order of the makers.    On the contrary,
they appear before us, and by their own premeditated act, as hav-
ing all of them received value from Mikell and Robinson.    They
set out no suretyship, but all acknowledge themselves fully and
absolutely bound to pay the sum of money in the note specified.

In fact, if there is or was suretyship in this case, it was a fraud
upon the payees and upon the world, or commercial world, to
omit stating it on the face of the instrument.

The note given was negotiable paper of the plainest character
or species, and while the makers are allowed to protect or fortify
themselves by all proper legal means against oppression, &c.
They are not the less bound, when it is amply in their power, as in
this case, so to word the instrument and so to conduct themselves
in framing it and putting it forth as a species of currency, that an
innocent purchaser may not be deceived into acquiring the paper
by their carelessness, negligence or omissions.

Courts generally, and as I humbly apprehend, courts of equity
especially, devote themselves to the suppression of fraud and a
prevention of its consequences.    They regard the beautiful prin-
ciple conveyed in the admonitory maxim, "*sic utere tuo ut alie-
num non lædas,*" as the very rule, which, being freely rendered,
expounded and applied in the affairs of life, will not only guard
the community against broils, crimes, nuisances, &c., but also pre-
vent the innocent from being defrauded and injured in their com-
mercial contracts, by the wary and designing.

Nothing is more frequently found in the books than the estab-
lished principle that a man may, by his own acts, as well of omis-
sion as commission, forever deprive himself of a defence or legal
protection which otherwise would have been perfect for his neces-
sities.

Take the case for instance of "Land's administrators *v.* La-
coste," 5 Howard's Rept. page 471.    The rights of defence were

ruled to have been yielded up by the maker because of his assurances that the note would be paid, and thus the innocent purchaser protected. It is useless to multiply cases or references on this point.

I cannot be wrong in asserting that if either party to a contract having it fully in his power, do, nevertheless, determine so to shape the instrument as to convey but one idea to the payee, and but one construction to the public, (encouraged by the laws of the land to purchase and deal in such evidences of debt,) he is without remedy in law or equity.

Equity endeavours harmoniously to follow the law, and it is a venerable and sound maxim of the latter that *"vigilentibus non dormientibus leges succurrunt."* And the rule as to deeds, &c., holds equally good as to promissory notes, that they are to be taken most strongly against the maker. ·

It is of no consequence at all, (as I humbly apprehend,) that the property was really purchased by McKnight and Bailey, the first makers of the notes sued on by respondent, (or in other words,) that W. H. Marten and W. Davis, complainant, were not the purchasers, but merely assisting the others by the weight of their names.

The law positively concludes that all participated in the consideration which passed and that the property was sold and credit given equally, (perhaps vastly more,) upon the faith of those so called sureties and their names. They became positively bound, no contingency provided for, and such language used, and such only as makes a promissory note the joint and several note of four makers, not only equally and fully bound by the law, but binding themselves without limit or restriction.

I do not admit, however, that styling themselves "security" or "surety" in the note, could have caused any difference; for it has been held in our own courts that adding the word "security" to the name of a maker does not affect or change his liability. Stevens & Pillet *v.* West & Hamilton, 1 How. p. 308.

By our statute, in seeking to collect such a note as complainant helped to make to Mikell and Robinson, it is lawful to proceed against "any one of the obligors or makers," &c. That is to say, we might have sued complainant Davis as a joint and several

maker alone, and without even naming, much less impleading the rest. Yet it is asserted that he is, in point of fact, only a surety, and entitled to protection as such at the hands of the law. A beautiful and solid protection that statute affords, which allows a creditor to select the pretended or real surety and wield the power of the law, for the collection of money, against him alone ! I think and aver that this very provision of the law shows that in the case of a note made by several, they are every where principals, and that the relation of principal and surety cannot be set up at all.

It has also been twice decided by our highest court that although you may implead all the makers of a joint or joint and several promissory note, yet you may discontinue as to some and take your judgment against any one or more. In other words, you may discontinue as to the principal maker who received the property, and have judgment against a " surety" alone; for this is clearly the result of the case. 2 How. 870; 4 How. 379. Can this be called protecting a surety, or allowing that such can be the position and attitude of any one maker of a promissory note ? To my mind it is an unequivocal denial that any such relation exists or can be predicated of joint or joint and several makers of notes.

Again. However the soundness of the decision may be questioned, it has nevertheless been expressly decided, that a discontinuance may be entered against the first indorser, and judgment be taken against one or more behind him. 4 Howard 293. Is this protecting a surety, or acknowledging the relation to exist? Nay more. It is our law, that want of notice to a prior indorser does not discharge a subsequent indorser who had notice; and this is not affected by the consolidation providing for sueing all together. 4 Howard 272.

His honor the chancellor need not be reminded that this consolidation act (of 1837) as it is termed, was designed for the protection of those much more worthy of being styled and regarded as sureties than the joint and several makers of a simple, unconditional promissory note. Even they are not protected under the circumstances mentioned in the case alluded to above.

In the U. S. Circuit Court of Maine, a branch, I believe, of Judge Story's jurisdiction, it has been decided, that where sureties

bind themselves as principals in a bond, there is no difference as to their liability in equity for the debt between them and the principal debtor for whom they are sureties. United States *v.* Cushman, 2 Sumners' Cir. Court Rep. 426.

Against this view the complainant's counsel seek to oppose the case of Sprigg *v.* Bank of Mount Pleasant, reported in 10 Peters, 257, in which case it was held that inasmuch as all the obligors acknowledged themselves bound as principals, they are bound as such, and could not be heard to set up a suretyship. All will approve that decision, which I assert confidently will, on examination, be found decisive of no point involved in this controversy, and really to have been greatly misapprehended and mistaken by complainant's counsel. I emphatically deny that the court ruled that where a surety sign an instrument without any designation of the character in which he is to be bound, he is not precluded from setting up a suretyship, as asserted by counsel of complainant in his brief. Indeed it was not necessary to decide upon that point, and the court did not decide upon it. The powers of a court of equity over such a case as that of Sprigg, for his relief, were not admitted at all, but merely for the sake of argument, as the language cited by complainant's counsel shows on its face. Now with all deference, I submit that this case from 10 Peters and the language of the court are decidedly in our favor. Sprigg, &c., were remediless because they acknowledged themselves bound as principals. I say that McKnight, Bailey, Martin and Davis, complainants, in making the note as it is framed and worded, did not only acknowledge themselves bound as principals, but their acknowledgment was as full and real and palpable as that made by Sprigg, &c. in said case. As thus, for illustration, say that the note of McKnight, Davis, &c. was offered as it stands for sale or negociation to a New Orleans merchant; he examines into its character, and finds upon its face that all the makers have bound themselves absolutely for payment of the money, jointly and severally. He finds, moreover, that there is no such word as principal or surety on the note. Does not the law authorize him to conclude that each and all of these makers are enjoying and in possession of the value received, as admitted on the note, and of the property purchased by the note? It assuredly does. Nay, more, have not

the makers themselves authorized him to come to that conclusion? Assuredly they have, by forbearing to use such language as would have admonished the proposed purchaser of the equitable rights some of them possessed as sureties, thereby making him cautious and vigilant in the premises? Assuredly they have. It is not the duty of the proposed purchaser to visit Mississippi so as to inquire into all the circumstances of the case, and the latent attitude of the parties; for by omitting to admonish this purchaser of the pretended relation of the makers to each other, they have expressly acknowledged that they relied on deriving benefit from no such matter. Each has acknowledged to him that he had no right to expect the purchaser to protect his rights as surety, while he was protecting himself in his attitude of creditor. Otherwise it would certainly operate as a fraud.

It is not only a sound legal, but a high moral and social duty, incumbent upon every man making contracts in writing, that he should insert all the particulars of the understanding, I mean all the important particulars. Hundreds of cases are found in the books to this effect.

How much negotiable paper is favored by our laws and commercial system, and how much a purchaser is sought to be protected, if the law can possibly protect him, I need not urge upon the court.

I confidently assert, then, that the note of complainant, &c. &c. not asserting or intimating a suretyship on its face, expressly admitted that all were principals, and thus the case in 10 Peters is decidedly in our favor.

The cases of People *v.* Jansen, 7 J. R. 337; Paine *v.* Packard & Munson, 13 Ibid, 174; King *v.* Baldwin, 17 Ibid, 384; and Rees *v.* Barrington, 2 Vesey 552, I shall not dwell upon; because they are cited merely to fortify cases by no means such as this before us.

I might insist, also, with at least plausibility, that any pre-existing rights of complainant, as surety in the note, were destroyed by the judgment rendered upon it, but I do not care to insist upon the point. I feel that I can do without it.

The case of Baird *v.* Rice, 1 Call 18, alluded to and relied upon by the complainant's counsel, merely establishes that, in case of a

levy upon personal property, under a judgment, against several persons, by virtue of *fieri facias*, if the plaintiff attends on the day of sale, and having received payment of part, directs a restoration of the property to him whose property it was, who afterwards absconds, the other defendants were free from the debt. This is undoubtedly true, and simply for the reason, that a levy upon a sufficiency of personal property is a *quasi* satisfaction of the judgment, and a perfect satisfaction if the plaintiff interferes, by causing its re-delivery to the defendant, &c. &c. Under such circumstances I am willing to admit, by reason of the principle just stated, that the other judgment debtor would be discharged; not because of his suretyship, but because in the eye of the law the judgment had been discharged by the levy and plaintiff's conduct in connection with it, and therefore there was an end of the indebtedness of all the defendants. But one satisfaction could be asked; no matter how many defendants there were, and that satisfaction had been made.

The case of Bullitt's Executor *v.* Winston, 1 Munf. 269, also relied on, is of the same character; and I do not feel myself called on to comment upon it.

2. We now come to the second point—the conduct of the respondent Robinson, in connection with the proceedings subsequent to the judgment, &c. &c. It will be recollected, I contend, that even admitting for the sake of argument or otherwise, that the question of suretyship, as made by complainant, can be gone into, (and this I confidently deny,) yet the complainant is as far from making out his case, or establishing a claim to the notice of the court, as he was before. The levy made on the land of McKnight, before the negroes were levied on and forthcoming bond given, is insisted by complainant as having created "a specific lien," and a security for the satisfaction of the judgment, which could not be released without consent of the surety, and of consequence without discharging him. Now, in the first place, all the property of McKnight, land as well as negroes, and of all the other defendants, came under a lien as specific as a lien upon any particular piece of property after the rendition of the judgment. Indeed, it is obvious, that when, by the statute and decisions of the Court of Appeals, a judgment operates as a lien upon all the property, real

and personal, of the defendants, it is a confusion or abuse of terms on the part of complainant to speak of creating a specific lien for satisfaction of the judgment upon any piece of property particularly. Thus the land first levied upon, and the negroes secondly levied upon by the sheriff, were all, each and every of them, dedicated by the law to the discharge of the judgment.

The sheriff's commands growing out of the precise exigency of the writ of *fieri facias*, issued against McKnight, Bailey, Martin, and Davis, the complainant, were plain and forcible. He was commanded "of the goods and chattels, lands and tenements," of the said defendants, to make the sum of —— dollars, the amount of the judgment. He was not limited to real or personal property, but was doing his duty provided he made it out of either. It is true, that from the terms of the statute, if a defendant shall tender personal property sufficient, no *fieri facias* shall be levied on lands and tenements of the defendant in execution; but this does not limit the operations of the sheriff under the *fi. fa.* until a tender of personal property by defendant. Poindexter's Code, page 200, section 20. This act I shall have cause to allude to again after a while. The sheriff then, in making his levy on land, perpetrated no wrong; but what was the effect of the levy on this land?

Does a levy on land satisfy, or *quasi* satisfy, an execution? Such seems to be the view of complainant's counsel; but no authority can be shown by him to that effect.

I admit that the general rule is, that a levy on a sufficiency of personal property is considered by the law as a satisfaction of the execution, at least for the time, as in the case of Baird *v.* Rice, and Bullett's Executors *v.* Winston, before commented upon. In such a case, the personal property vests in the sheriff for the benefit of the plaintiff in execution. He takes possession and gives possession when a sale is had; but a sheriff neither takes possession nor gives possession of land; on the contrary, he is expressly deprived of the power to put the purchaser at his sale in possession of the lands sold, by our statute.

Hence it is clear that the levy on the land of McKnight was no satisfaction of the execution, and its being levied on constituted *ipso facto* no discharge of the other defendants in execution.

William Davis *v.* John J. Mikell *et al.*

That the first levy was on land is shown by the deposition of the sheriff, and by the brief of complainant's counsel.

But great stress is laid on the fact that McKnight, after levy upon and advertisement of his land, came forward and tendered negroes to satisfy the execution, whereupon a forthcoming bond was given, &c.; and when this was done Sheriff Demoss "considered the levy on the land cancelled;" and thus it does not appear on the record at all.

Now if we advert again to the act found on page 200 of Poindexter's Code, section 20, we find that land is given a sort of fiscal or feudal superiority over personal property, and that the officer is not suffered to levy on land of a defendant if personal property sufficient is tendered to him; and this rule of conduct was and is obligatory upon the officers of the court, notwithstanding now-a-days negroes have become vastly more valuable than land.

It is not denied by opposite counsel that if negroes had been tendered at the time of the levy on the land of McKnight, the sheriff would have been compelled to take the negroes and pretermit the land for the time, such is the stringency of the statute for such cases made and provided. The policy of the law being evident, can it be asserted or shown that McKnight was absolutely barred or estopped from bringing himself within this policy, and saving the habitation of his family and the scene of his labors at any time before sale by the officer, merely because the officer had made a levy on the land, which is, as it were, a mere "demonstration" towards collecting a debt in a particular way? I cannot for a moment think so.

A party defendant may have his negroes levied on, they may be taken from his possession, and after due notice of the pendency and urgency of the execution, may not tender his forthcoming bond until the day before the sale at least, and as the forthcoming bond law is practically expended, at the very instant of sale may tender his delivery bond, and yet a debtor shall not save his habitation and his crops, &c. by giving up negroes in satisfaction of the debt, merely because the officer says he has made a levy on land. With deference to the court and opposing counsel, the idea is preposterous.

The levy on the negroes was then valid and in conformity to
47*

the exigency of the writ of *fieri facias;* and even if disapproved of by complainant Davis, being legal in itself, his consent was not to be asked. Besides, this proceeding, (if Davis really was a surety,) was palpably for his benefit, inasmuch as negroes are perishable and removable, and it is best that such property should under existing circumstances be given over to the discharge of an execution, if it is possible to do so. In the mean time, the lien on the land is preserved by the laws of the land, to be resorted to if the negroes fall short.

The negroes being levied on, a forthcoming bond was given, into which complainant refused to enter, and it is insisted that this was making a "new contract," by which he was discharged. A binding contract must be made by one both "able and willing to contract." It is of the essence of it that it is voluntary. What the statutes permit to a defendant cannot be the plaintiff's contract. The forthcoming or delivery bond was intended, in the first place, to save to the defendant in execution the expenses attending the keeping of the property until the sale, which might be a considerable length of time; and also it was presumed that the defendant would take better care of perishable property than the officer. Tuck. Com. 2 vol. It was not intended, (however since perverted in practice,) to give a certain delay of payment to the debtor.

I presume it will not be denied that a sheriff is compelled by the law to take a forthcoming bond, if the signers are good. By the act of 23d Jan. 1824, it is enacted that it shall be the duty of the sheriff serving an execution on slaves or other personal property to take such a bond, "if the person whose property is levied on will give sufficient security," &c. If then the levy on the negroes was valid, the sheriff was forbidden to refuse to take a forthcoming bond of McKnight; and, from the language of the act, it is his duty to receive it, "if the person whose property is levied on will give sufficient security," and even though co-defendants are omitted or refuse to go into the bond; otherwise the statute and its reasons of policy would be defeated. 5 How. 480.

The giving the forthcoming bond to the sheriff, then, being a legal right conferred on any of the defendants whose property might be levied upon, thus far certainly no new contract was made by the plaintiffs in the discharge of complainant. The law

forces, absolutely forces, the plaintiffs into this predicament. The forthcoming bond-law does not ask the plaintiffs to consent or to step forward and make this, so called, "new contract." Indeed it is clear to my mind that if plaintiffs are allowed to think and act independently on such matters, they will never voluntarily consent to keep money from their pockets by the delay of a forthcoming bond.

Complainant contends not only that this was a "new contract," but that it was made without his consent; that he was not a party to it, and "was thrust out of the case."

"No state shall pass any law impairing the obligation of contracts." Can the law, nevertheless, force a plaintiff into a *new* contract?

From what has been said and cited, it is clear that it is not a "new contract." Secondly—if done without his consent, still he must blame the law, not the defendants; and, thirdly, if he was "thrust out of it," he thrust himself out, by his own acknowledgment, and his almost passionate refusal to enter into the forthcoming bond.

By going into the bond he might at once have paid the debt and been subrogated to the rights of the creditors, and "succeeded in his remedy."

But it is contended on the other side that the security afforded by the first levy had been lost by the release of the land and a new levy. To this it is obvious to answer that there was no release at all, and the land continued as fully subject to the judgment as it was upon its rendition, or at any time thereafter. And, even admitting that complainant was hardly dealt by, the sheriff produced it, and he must look to him. If he had levied on personal property in the first place, sufficient to satisfy the debt, complainant's discharge might have been made out; and this is strictly consistent with the principle that *directly in the line of his duties*, and in treading that line, he is as much the agent of plaintiff as of the defendant.

I am informed that this court has decided (as it certainly is the law) that a sheriff, commanded to make dollars, cannot take paper money, or mules, or horses, in satisfaction of the execution. He

is not treading the line of his agency, as defined by the law and defined by the exigency of his *fieri facias*.

If these proceedings were legally taken, either ordered by the law expressly or sanctioned by it, it was *damnum absque injuria*, no matter what disagreeable consequences resulted from them. These difficulties and results are presumed to be in the eye of every one who becomes bound to pay his own or another's debt, and cannot possibly be charged either to the plaintiff or the law of the land.

But the forthcoming bond was given, (although not made by complainant Davis,) and respondents are, as expressly stated in the answer, no farther connected with it than by their indorsement through their attorney, viz. "the sheriff will receive this bond in the case specified therein. Oct. 29th, 1839. Briggs, att'y." This will probably be used to eke out the assumption that the intervention of the forthcoming bond was making a new contract, and that this indorsement was evidence of the contract. This is easily answered.

I hope it is perfectly plain that, in the abstract, the giving a forthcoming bond is not making a new contract for a valuable consideration—see Newell &c. *v.* Hamer &c. 4 How. 684; for, if so, certainly the law assumes to make new contracts for parties litigant without the consent of one of them and for the benefit of the other, most decidedly.

But does the indorsement aforesaid make a contract, and a "new contract," out of that which is no contract at all? If so, it is a potent indorsement, indeed.

The object, scope, tendency and utility of that indorsement are plain. The sheriff says he was not convinced of the propriety of receiving the bond without the name of Davis, who flatly refused to become a party to it.

The bond was in the possession of the sheriff, having been brought to him ready perfected; and he applies to the other party to know whether the bond (as it was) would be considered good as to the signers. The plaintiffs, by attorney, confiding in the solvency of the signers, and not wishing to be hard or exacting, agree to the reception of the bond as taken by the sheriff. It is nothing more, in short, than the expression of a willingness to

risk that bond, the names being genuine. Nothing more can be tortured out of it.

Assuredly it would be going an unconscionable length to assert that, in addition to this, the plaintiffs' attorney guaranteed the genuineness of the signatures also, in addition to their solvency. It turned out that Elias Vickers had not made the bond, although the sheriff had received it with his name upon it, and said Vickers having got the execution stayed by supersedeas, induced the court to quash the bond, so far as he was concerned.

S. C. Barton, finding the court in a quashing humor, also obtained an order for his discharge from it, and there being then none but two insolvent names, it was quashed as to them, so as to enable plaintiffs to resort to the original judgment. What was there wrong or illegal in this, and what say the cases as well as the philosophy of forthcoming bonds.

In the first place, as has been before remarked, the object in awarding the use of the delivery bond, was to save the expense of keeping the property in the sheriff's hands between the levy and sale; secondly, to preserve the property.

In seeking to accomplish these objects the eye of the law could not fail to see that it was reposing considerable confidence in the defendant to whom the property should be delivered, and who might eloign and remove it. To counterbalance this and render justice to the plaintiff in execution, as well as favor to the defendant, security was required for the forthcoming of the property. In these days great delay also ensues upon the giving of this bond, which is resorted to merely for delay.

It is obvious that the security of the bond is entirely for the benefit of the plaintiff; and if he chooses to relinquish the security derived from it, and risk resort back to the original judgment, I cannot doubt that for sufficient reasons he has a right to do so, and perhaps, without sufficient reasons, of his own mere motion. A defendant cannot quash his forthcoming bond, except for real defects, if he can quash it at all, which is doubtful to say the least. He cannot readily do this, because he is thus seeking after the risk of the loss of the debt by giving him possession of the property and the delay occasioned by the resort to the bond, to deprive the plaintiff of that security which the defendant tendered himself, and

which plaintiff may regard as furnishing the only reliable means of saving his money. What is the consequence should a plaintiff even arbitrarily set aside a forthcoming bond given for his security? He obviously loses, with us, six months more, for another bond may be given when his execution comes out on his original judgment. Does this course prejudice the defendant? Certainly not: he has derived all the possible advantages from the use of the bond, and will get an opportunity of giving another bond, and gaining more time by this course of the plaintiff. Neither is injured, and the plaintiff has a right to dispense with the protection and security devised for his benefit. He may also elect to consider a forthcoming bond signed by the parties alone, without securities, as good, and elect to stand by it. 3 Call, page 13.

I firmly believe it to be the law that a plaintiff may of his own mere motion, and without any reason given, risk the safety of his debt by quashing the forthcoming bond given by the defendant. Indeed it is not a little remarkable, that nearly every case of bond-quashing found in the books, records that it was done by the plaintiff, and for reasons which would not have justified it on the part of the defendant.

Now, according to late Mississippi decisions, a forthcoming bond is forfeited, and is a judgment on the day of delivery of the property, and default made. 4 Howard, page 347. If the bond is vacated, however, set aside or annulled at the next term, there is no such judgment of course, no lien created by it, and no satisfaction of the original judgment. In other words, a forthcoming bond forfeited, even though defective, is a bar to any further proceedings on the original judgment until quashed. Taylor *v.* Dundas, 1 Washington, page 92.

" The old right does not close until the new is authorized to succeed it," language of Judge Roane in Lusk *v.* Ramsey, 3 Munford, page 454. A forthcoming bond forfeited is not the same as actual payment, or satisfaction of the original judgment. Randolph *v.* Randolph, 3 Rand. page 490. And if on action on a bond executed by principal and surety, judgment go against the surety alone, and he gives a forthcoming bond which is forfeited, this will not discharge the principal. Same case, page 490. Again, two separate suits are brought against maker and securities; forthcom-

ing bond is given by the maker, prior in time to that given in the judgment against the security. Held, that the forfeiture of the forthcoming bond against the maker was not a satisfaction of the judgment against the security. McNutt &c. *v.* Wilcox & Fearne, 3 Howard 417. I cite this case more particularly to show that the giving of a forthcoming bond by the maker was not pretended for a moment to have been a new contract, operating to the discharge of the surety. Such a ground is not hinted at for a moment. I refer generally to Taylor *v.* Dundas, 1 Wash. 92, and Downman *v.* Downman's Executor, 2 Wash. 189.

But it is not denied or controverted, that Elias Vickers had a right to release himself upon plea of *non est factum* to the bond, and if its strength could be demolished and annihilated by the action of the court, in retiring two of the obligors, and the only two of any avail, had the plaintiffs made any absolute contract sustained by the bond at all events, and though but one should remain bound in connection with it? The idea is most strange. The plaintiffs were therefore authorized, and being executors and fiduciaries, they were positively bound to do away with the bond under the circumstances, and get back upon the strength of the original judgment.

What says our statute? "If a forthcoming bond be at any time quashed as faulty, the obligee or obligors in such bond may have execution on his or their judgment, in the same manner, as if such forthcoming bond had never been taken." Poindex. Code, page 204, section 30.

We say, then, that our bond having been useless to us, and having been quashed, we have the best authority for reverting back to the original judgment against McKnight, Bailey, Martin, and Davis. That Davis is in this judgment is, and was his own fault, and if he should be injured, it is *damnum absque injuria.* The law cannot indemnify against the imprudence of giving promissory notes or becoming surety for another. A simple remark or two, and I shall conclude this argument.

It seems to me that the whole merits of the complainant's claim to the consideration, depend on the assertion of a principle, than which nothing is more unfounded in law or more unreasonable,

viz.: " that an execution is satisfied as well by a lien on land as on personal property."

It is assumed also that a forthcoming bond is a new contract between plaintiff and the first maker, operating to the discharge of the latter, but I cannot but regard this as a mere make-weight. If any one respectable case can be found in favor of either of these positions, I shall yield, if not gracefully and willingly, at least without any very rebellious murmurings. The case in 4 Howard p. ——, is very full on this subject.

Concerning the law tending generally to the discharge of a surety by reason of the conduct of the principal, opposite counsel and myself do not differ in many particulars. I therefore have not discussed it, except as applicable to the special facts of this case.

FOOTE and HUTCHINSON in reply.

In the face of the authorities cited by complainant, respondents' counsel has attempted to show that where the parties to a note or other instrument neglect to designate the character in which they are to be bound, by the words principal and surety, the surety is thereby precluded from alleging that he was surety only. He assumes the position that the surety thus enables the payee to assign such note or other instrument to a third person, who may be ignorant of the fact that he is liable only as surety; that this is a fraud upon the commercial world, and therefore such surety cannot assert, either in a court of law or equity, that he is liable as such, or claim that protection which the law extends to that class of debtors.

In support of this position by respondent he cites the cases of Land's administrator *v.* Lacoste *et al.*, 5 Howard, 471, and Hamer *v.* Johnston *et al.*, 5 Howard, 724. What principle of law is declared in these cases? Under our statute, the maker of a note has a right to impeach the consideration, &c. of such note in the hands of the assignee. But it was declared by the court, that the advantage afforded the maker or makers of a note, by this anti-commercial enactment, might be lost or waived in certain cases. That where the reception of the note by the assignee has been superinduced by the assurance of the maker that he has no de-

fence, such maker shall not be allowed afterwards to set up his defence against the assignee.

But where the contemplated assignee makes the inquiry of a surety to such note, and known to be such, and who was ignorant at the time of the facts constituting the defence, the assurances of such surety, it is declared, shall not prevent him from setting up his défence, even as against the assignee. See Honore *v.* Dougherty *et al.* 4 Bibb, 280. And for the plainest reason, that a surety who may, and often is, unacquainted with the consideration of the note, shall not thus be entrapped by a third person, and thereby deprived of any meritorious defence he may have.

The position of the respondent is, however, overthrown by his own admissions. (See his argument.) "I do not admit, however, that styling themselves 'security' or 'surety' in the note, could have caused any difference; for it has been held in our courts that adding the word 'security' to the name of a maker does not affect or change his liability." Stevens and Pillet *v.* West and Hamilton, 1 How. 310.

The argument of respondent is this: because the payee of a note made by a principal and surety without any designation of character, might assign such note to a third person unacquainted with the relationship of the makers; therefore the surety shall be considered in the light of a principal, and be absolutely bound as such. But before this principle can be deduced, in view of the case of Stevens and Pillet, it must be presupposed that in no possible case can the relation of principal and surety be set up at all. We are willing to concede every principle decided in the cases cited by respondent in support of his first position, but with due deference we confidently assert, they fail utterly in sustaining it.

Again, the same ground is inferred from the decisions of the High Court of Errors and Appeals in the cases of Vickery *et al v.* Rector, 4 How. 293, and Wilcox *et al.* Mitchell *et al.* 4 How. 272. In the latter case, the court, in their construction of the statute of 1837, take the ground simply that the statute alluded to does not alter the rule, that when indorsements are separate and distinct, want of notice to a prior indorser will not discharge a subsequent indorser who had notice. This is certainly but asserting a principle plainly laid down in all the books on commercial law. Chitty

VOL. 1—48

on Bills, 528. . If an indorser of a bill or note receive notice of its dishonor, he must immediately take it up, and give notice to the antecedent parties whom he means to charge; otherwise they will not be holden. Morgan *v.* Woodworth, 3 J. Cases, 89. The remedy of a subsequent indorser is here clearly pointed out; upon receiving notice of dishonor he may have recourse by taking up the note or bill and notifying prior indorsers. See, also, 5 Cowan, 303. This is declared to be the law, with regard to indorsers, in New York; yet the relation of principal and surety, as between the makers of promissory notes, has been frequently recognized to exist. See Fulton *v.* Matthews & Wedge, 15 J. R. 433, and many other cases.

Sureties, (properly so called,) and indorsers stand on different footing; the distinction between them is clearly drawn in the case of Bullitt *et al. v.* Thatcher *et al.* 5 Howard, 689. Chief Justice Sharkey says, "to a certain extent, and for certain purposes, an accommodation indorser may be regarded as a surety. The object of such an indorsement is to secure the debt, but the undertaking or contract, in a strictly legal point of view, is materially varied from that of an ordinary surety. In the one case, it is several only, whilst in the other it is always joint or joint and several. An indorser undertakes to pay the debt himself on condition: when the condition is performed by giving him notice of demand and refusal, his undertaking becomes absolute, it is not secondary."

"A mere surety in a joint liability may resort to chancery and compel the holder of the bond to use proper diligence. In both cases, however, a new and binding contract for delay would discharge the surety."

The rights of sureties, and the limits of their undertaking are here asserted in most emphatic terms. It is useless to multiply cases on this point. It remains to be considered whether in this case the complainant is entitled to a discharge.

We have attempted to show, that by the first levy on the land of McKnight an available security was obtained for the payment of the debt; that by releasing that and resorting to other property, the complainant was deprived of the advantage of that security; and that by the taking of a forthcoming bond, under the circumstances, without the seal, and consent of complainant, deprived

William Davis *v.* John J. Mikell *et al.*

him both of the right of subrogation, and his remedy in a court of equity by a bill of *quia timet.*

It is admitted that by the statute of 1824, all the property of the defendant, whether real or personal, is bound by the judgment, just as it was formerly under the statute of 1822, by the delivery of the execution to the sheriff.

What, then, is the effect of this general lien? It confers the right on any or all of the defendants' property for the satisfaction of the judgment, to the exclusion of all other adverse interests arising subsequent to such judgment, and if not lost by the delay of plaintiffs, upon making the levy and selling, the title of the purchaser relates back to the time of the judgment, and cuts out intermediate incumbrancers. It is true, that since the repeal of the 55th section of chapter 27, Poindexter's Code, page 212, the sheriff cannot put the purchaser of real estate under execution into possession. He is turned over to his action of ejectment. But, in nearly all other particulars, the lands of judgment debtors are treated as chattels. They may be tendered to the sheriff by the defendant, in discharge of his body taken under a *ca. sa.* the same as slaves or other personal property. Rev. Code, 199, sec. 15.

When they are taken by the sheriff under a *fi. fa.* and remain in his hands unsold, he cannot abandon the levy and proceed against other property of the defendant, but must make return accordingly, and the lands so levied must be sold under a writ of *venditioni exponas.* Rev. Code, 200, sec. 18.

Would it not be absurd to say, that when the defendant failed to tender personal property in the first instance, the sheriff is at liberty to abandon a levy made on land sufficient to satisfy the judgment, and resort to personal property, as in this case? We have shown that sureties may be discharged by acts of the sheriff alone. 3 Munf. 417.

In this case the sheriff resorted to personal property, on the day appointed for the sale of the land first levied, with the express approbation of the respondent, under circumstances well calculated to awaken him to the hazard of the course pursued by him. We do not insist that the first levy was a satisfaction of the judgment; but it entitled the sheriff to proceed with the sale for that object: and insist, confidently, that releasing that levy and taking a forth-

coming bond, without the consent of complainant, was a fraud upon him.

If Davis had been a co-maker of the note as principal, and the forthcoming bond (taken without his seal) had not been quashed, he would have been entirely free from the original judgment, however fruitless the statutory judgment might have been. Sanders *et al. v.* McDowell, Adm'r, 4 How. 9. No execution could have issued on it. It could not have been reversed for error. 1 How. 64; 2 Wash. R. 183; 3 How. 34, 60. ·

Without inquiring whether the circuit court erred in quashing the bond, we contend that, until it was quashed, its effect was the same upon the original judgment, and as completely suspended all farther action on it; and the hands of the plaintiffs in that judgment as completely bound. The sheriff was authorized by the plaintiff in the execution (Robinson) to receive the forthcoming bond. Respondent expressly states in his answer that the indorsement on the bond by his attorney was made by his orders. The taking of the forthcoming bond was, then, emphatically the' creation of a new contract between the creditor and principal debtor.

The CHANCELLOR,

The complainant files his bill for the purpose of being relieved against a judgment at law in favor of the present defendants, founded upon the joint promissory note of one John McKnight, with the complainant and others. Upon the face of the note the makers all appear as principals. It is alleged, however, by the bill, and admitted by the answer of the defendant Robinson, (who is now the sole executor of Moore,) that the complainant was, in point of fact, a mere surety, and that McKnight was the principal debtor.

It appears, from the proofs in the case, that, after the judgment was recovered, an execution was issued and levied upon a quantity of land belonging to McKnight, which was regularly advertised for sale. In the mean while, and before the day appointed for the sale of the land, the sheriff levied the same execution on some personal property of McKnight, and took a bond with sureties from him, conditioned for the delivery of such property, in the

manner .required by the statute on that subject, and thereupon. abandoned the levy made upon the real estate. The complainant, being one of the defendants in the judgment, was required by the sheriff to unite in the bond so taken, that it might conform to the execution; but he expressly refused to sign it, and remonstrated against a dismissal of the levy on the land, and urged that it should be sold according to the advertisement, saying that he would make it bring the amount of the judgment and costs.

The defendant admits that he agreed to receive the bond as it was made. This bond was afterwards quashed, on motion of the obligors, in the circuit court, and the plaintiffs at law (who are defendants in this court) have resorted back to their original judgment, and are attempting to enforce its collection by execution against the complainant.

It is admitted that McKnight and the other parties to the judgment have in the mean time become entirely insolvent. Whether these facts entitle the complainant to any relief, in his character of surety, is the question to be examined. There is, however, a preliminary question made by the counsel for the defendants, which must be disposed of before I proceed to notice the case on its merits.

It is contended, as the complainant appears from the face of the note to be a joint maker, without any designation of the character in which he signed it, that he' is to be regarded as a principal, and is estopped by the form of his contract from averring the contrary. The rule at law in England seems to be this: where several persons bind themselves jointly and severally by the terms of their contract, and nothing appears from the face of it to show that there exists the relation of principal and surety, all are to be regarded as principals. In such case it is said that the form of the contract precludes a party from averring at law that he signed as surety. Rees *v.* Barrington, 2 Ves. jun. 542; Theobald on Principal and Surety, 117. But in a court of equity, so far as I can find, it has not been doubted, either in England or in this country, that the true relation of the parties may be shown, notwithstanding the form of the contract holds them all out as principals. The authorities referred to expressly admit this position. The same distinction is recognized, and the same doctrine admitted, in the

48*

case of Sprigg *v.* Bank of Mount Pleasant, 10 Pet. R. 257; also in the case of The People *v.* Jansen, 7 John. R. 336.

I think, then, that this preliminary objection cannot be sustained. Whether the complainant is not precluded from the relief which he seeks, by reason of the judgment against him, is a question of much graver character.

In the case of Bay *v.* Talmadge, 5 John. Ch. R. 305, chancellor Kent held, that after a judgment against a surety, he becomes bound as a principal debtor; that it is then too late to inquire into the antecedent relations between the parties, and that, the surety cannot afterwards avail himself of any want of diligence on the part of the creditor, in pursuing the principal debtor.

The case of Lenox *v.* Prout, 3 Wheat. 520, is supposed to be an authority to the same effect.

A different rule has been laid down in the case of Baird *v.* Rice, 1 Call. 18, and of Bullitt's Executors *v.* Winstons, 1 Munf. 269. These cases show that a surety will be relieved *after* judgment, upon the same principles which would entitle him to relief before judgment.

The case of Sneed's Executor *v.* White, 3 J. J. Marshall, 527, sustains the same doctrine.

I am relieved from deciding between these conflicting authorities by a decision of our own supreme court upon the point in question. Newell & Pierce *v.* Hamer *et al.* 4 How. Rep. 684. I understand the doctrine of that case to be, that a *judgment* against a principal and surety does not convert the surety into a principal debtor, so as to strip him of any equity he might subsequently have against the creditor, growing out of his character as surety. I not only yield to that decision as a binding authority, but humbly conceive that it is fully sustained by the soundest principles. I perceive no solid reason for dispensing with the same measure of good faith, on the part of the creditor towards a surety, *after* judgment, which he is required to observe *before* judgment. The whole doctrine of equity, in extending relief to sureties, rests upon the moral and equitable obligation of the creditor to obtain payment from the principal debtor, or at least to do no act by which the liability of the surety is increased, or the means of recovering the debt from the principal may be lost. It

is difficult to see how the act of the creditor, in reducing his debt to a judgment, can absolve him from any pre-existing duty which he owed to the surety, or take away the right of the surety to avail himself of any subsequent act of the creditor, by which the payment of the debt is attempted to be unjustly and exclusively thrown upon him, without the hope of remuneration. ·

Having thus shown that the complainant is not estopped, by his attitude in this case, from seeking relief, it remains to be seen whether he is entitled to the relief which he asks. This must depend upon the effect of the levy made upon the land, and the subsequent abandonment thereof, and upon the privity and connection of the defendant with that procedure.

There can be no doubt, upon principle, that if the first levy had been made upon sufficient personal property of McKnight to satisfy the execution, it would have effectually discharged the complainant, notwithstanding any subsequent release of the property so seized. This consequence would have followed from the fact that the judgment was a joint one against the principal debtor and surety. 3 Serg. and Rawle, 465; 2 Dallas, 373. Although a levy may be released by the consent of the plaintiff and principal defendant, and a new levy made as to such defendant, yet I apprehend that where such release is made not only without the consent of the surety in the case, but in the face of his declared remonstrance against it, he would be thereby discharged. This question was directly decided in the case of Baird *v.* Rice, 1 Call's Rep. 18. In that case the property of the principal debtor was seized under a writ of *fieri facias,* and afterwards restored to the defendant, by order of the plaintiff without the consent of the defendant's surety, and it was held that the surety was thereby discharged, and that a new execution could not properly issue against him on the judgment. The difficulty in the case before me consists in the levy having been made on land, in the first place, instead of personalty, and it is urged that this difference places it without the rule just referred to. I find it laid down in the English books that after an *elegit* has been extended on the land of the defendant, no other execution can issue against his personal property unless the *elegit* is quashed or otherwise proves ineffective. Cro. Jac. 338; Bac. Abr. tit. Execution D; 1 Archbold's Prac. 273. Hence I conclude,

that although a levy on land does not discharge the defendant, because it does not of itself divest his title thereto, yet while it is pending and undisposed of it must be regarded as a *quasi* satisfaction to the extent of preventing a new execution or a further levy upon personal property, provided the land is sufficient for the payment of the debt. Hopkins *v.* Chambers, 7 Monroe's Rep. 262.

In the case of McGehe *v.* Handley *et al.* 5 How. Rep. 625, the High Court of Errors held, that after an execution had been levied on land and the sale postponed, according to the provisions of the statute of 1840, the levy still continued in force, being merely suspended by operation of law, and that pending that levy no new execution could be issued with a view to a levy on other property. Chief Justice Sharkey, alluding to the first levy made on the land by the sheriff, says, "having enough in his hands, it would be unjust and oppressive to authorize him to take more, and a levy is presumed to be a sufficient one. A first sufficient levy must be disposed of before a second can be made." The present is a much stronger case. Here the sheriff, after a levy upon land sufficient to satisfy it, without any return of the execution, and while the levy on the land was still pending, made a further levy upon personal property, and then proceeded exclusively against such personalty, abandoning entirely the levy upon the land of the principal debtor. That the conduct of the sheriff in this particular, was approved by the defendant Robinson, is sufficiently evident from his answer. He admits that he interposed no objection, and strongly intimates his approval of the sheriff's action in the matter, but at the same time interposes the guarded and cautious denial that these steps were taken "at his instance." If it be true that after the levy upon the land no new execution could issue, it must be because such levy had the effect of pledging the land for the payment of the debt.

That the abandonment of the levy on the land and making a levy on the personal estate of the debtor amounted to a waiver of the lien created by the judgment, is, I think, perfectly clear upon both principle and authority. A purchaser of the land, after the levy on it was released and a new levy made on the personal property of McKnight, would certainly have held it discharged from the judgment lien of the plaintiff at law. 13 John. R. 533. And

it would follow as a legal consequence that if the lien or pledge thus acquired, was lost by the neglect of the creditor, the surety should be discharged. If a creditor discharges a lien which he has obtained upon the property of his principal debtor, acquired either by virtue of a judgment or the levy of an execution, I am unable to perceive any reason why the same consequences should not follow as to a surety, which would attend the discharge of a lien acquired by contract.

In the case of Sneed's Executor *v.* White, 3 J. J. Marsh. 527, it was held that a stay of execution by a creditor after a levy made on the property of the principal debtor, by which the lien on the property was lost, would exonerate the surety, unless his assent to such stay was first obtained. It is well settled that where a creditor releases any security which he holds, for the payment of his debt, the surety is thereby discharged, to the extent at least, of the value of the thing released. Hays *v.* Ward, 4 John. Ch. 129. In the case of Lechtenthaler *v.* Thompson, 13 Serg. & Rawle, 157, the doctrine was carried still farther. The court held that where a creditor has the means of satisfaction, actually or potentially in his hands, and does not choose to retain them, the surety is discharged. So in the case of Caple *v.* Butler, 1 Cond. Eng. Ch. Rep. 543, it was held that where a creditor loses by his neglect, a fund pledged for the payment of his debt, he could not afterwards resort to the surety. In the case before me, it is evident that Robinson knew of the levy on the land, and tacitly assented to its abandonment, by accepting of the forthcoming bond subsequently taken. The effect of this procedure was the loss of the lien upon the land; when it is shown by the proof, that if the land had been sold according to the advertisement, the surety stood ready to make it bring the debt and thus satisfy the creditor, and at the same time indemnify himself against loss. While this state of things was in progress, it seems that McKnight's property was placed beyond the reach of the judgment, and he himself became insolvent. To hold the complainant still liable under such circumstances, would be to depart from all the rules established for the protection of sureties. I shall accordingly direct a decree for the complainant, perpetually enjoining execution against him, from the defendant's judgment at law.